### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-14067-CR-MARTINEZ/LYNCH

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

**v.**

**DANIEL SMITH,**

   **Defendant.**

_____/

FILED by ___ea___ D.C.

SEP 1 7 2010

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO
### SUPPRESS PHYSICAL AND TESTIMONIAL EVIDENCE [D.E. #18]

**THIS CAUSE** having come on to be heard upon the aforementioned motion and this Court having reviewed the motion, the government's response, and this Court having conducted an evidentiary hearing on September 7, 2010, at which time testimony, evidence and arguments of counsel were received, this Court makes the following recommendation to the District Court.

  1. At the outset of the evidentiary hearing, AFPD Rosen-Evans stated on the record that she did not intend on calling Dr. Michael Brannon as a witness for the Defendant at this hearing. Further, Ms. Rosen-Evans pointed out that she had attached a copy of Dr. Brannon's report to the Motion To Suppress as an exhibit. Ms. Rosen-Evans announced on the record that she was withdrawing that as an exhibit and requested that the Court not take any of the information contained within Dr. Brannon's report into consideration in making the Court's decision concerning this particular motion.

_____

### Special Agent Brian Ray - ICE

  2. Special Agent Ray of ICE was the first witness called by the government. The government reviewed his background in law enforcement both during his time in the

1

United States Air Force and subsequent law enforcement experience in the public sector. The pertinent portions of that prior experience, for this Court, involve the fact that Agent Ray has had the occasion to arrest people under the influence of drugs or alcohol. He has also had the opportunity to view individuals who were later determined to be under the influence of drugs and/or alcohol during his past law enforcement experience.

3.      Agent Ray's involvement in this case began in October of 2009. At that time his supervisor gave him information from a Detective Grimmich of the Sebastian Police Department concerning an anonymous tip given to Treasure Coast Crime Stoppers on or about October 5, 2009. The three page anonymous tip was admitted into evidence at this hearing as Government's Exhibit No. 1.

4.      This anonymous tip advised the Sebastian Police Department that the anonymous caller knew an individual who resided in Sebastian, Florida, who was employed at the CVS pharmacy located at the corner of 53rd Street and U.S. Highway 1 in Vero Beach, Florida. The anonymous caller advised that they did not know a specific address for the individual's home or a description of that home. The anonymous tipster informed the Treasure Coast Crime Stoppers that the individual whom they were calling about currently had images of "child porn" on his personal computer. Specifically the tipster advised that the files were located in the downloads folder of the subject's computer and that this "child porn" involved adult men in sexual acts with small children.

5.      Subsequently thereto on October 8, 2009, the tipster again apparently called Treasure Coast Crime Stoppers and advised that the same subject had child pornography on his laptop computer, gave a date of birth, and a MySpace account number and web site. At this time the tipster also advised that they had seen the "porn" on the subject's laptop.

6.     Additional information was received by the Treasure Coast Crime Stoppers on October 28, 2009. The information named the subject as Dan Smith, later determined to be this Defendant. The tipster advised that Dan Smith was a white male approximately 5'9" and 45 years of age. Further, the tipster advised that the subject of the anonymous tip had been in the Indian River County Jail in 2006 for DUI. This is the sum and substance of the tip.

7.     Based on this information, Agent Ray contacted Detective Grimmich and discussed the tip. It was confirmed that a Dan Smith did work at the CVS pharmacy listed in the tip. Agent Ray issued a subpoena to Comcast to determine if there was an internet account for the Defendant at the address Detective Grimmich was able to obtain for the Defendant in Indian River County. Government's Exhibit No. 2 admitted into evidence at this hearing is a response from Comcast. Comcast responded that a Daniel Smith resided at 357 Keen Terrace in Sebastian, Florida, and had an internet account with Comcast since August of 2008. There were several IP addresses listed for that account from its inception until the time of the response by Comcast which was November of 2009. Those various IP addresses are listed on the second page of the Comcast response, Government's Exhibit No. 2.

8.     After receiving this information, Agent Ray attempted to search on line and determine whether or not he could locate any evidence or indication that the Defendant's computer was participating in either the downloading or uploading of child pornography. Agent Ray's investigation was unable to determine any such evidence. No information was found in the various databases utilized by ICE for that purpose. There was further discussion between Agent Ray and Detective Grimmich. Detective Grimmich wanted to conduct trash pulls or utilize other investigative techniques before the matter proceeded any further.

9.     Agent Ray later contacted Detective Grimmich in March of 2010 concerning this matter and discussed doing a "knock and talk" at the Defendant's residence. Agent Ray testified that he was going out of town at that time and that other investigations were taking precedence over this matter. This was given as an explanation by the government as to why the matter was not pursued until August 3, 2010 when Agent Ray, Detective Grimmich, and Detective Acosta of the Sebastian Police Department went to the Defendant's residence.

10.    On August 3, 2010, the aforementioned law enforcement officers went to the Defendant's residence to conduct a "knock and talk." They arrived at the Defendant's residence which is a duplex. They knocked on the door. They noticed that all of the windows were open. They received no answer to their knocks. The neighbor in the adjoining duplex asked who it was and Agent Ray stated that it was the police looking for Mr. Smith. The officers kept banging on the door and calling for the Defendant through the open windows surrounding the home. Detective Grimmich and Detective Acosta were walking around the duplex calling into the open windows while Agent Ray continued to knock on the front door.

11.    Agent Ray noted that the blinds to the windows were closed even though the windows were open. Through the blinds Agent Ray could see mounds of beer cans inside which are more particularly reflected in Government's Exhibits Nos. 4, 5, 6, 7 and 8 admitted into evidence at this hearing. Agent Ray stated that he could also see a laptop in the living room. However, no persons were observed.

12.    Agent Ray then knocked on the adjoining duplex and met the neighbor, Darlene Fowler. Agent Ray asked her if she knew the Defendant and if he was home. She stated that if the Defendant's car was there, which it was, and the windows were open, that the Defendant should be there. She told Agent Ray that she was concerned that the

4

Defendant was not answering the knocks and that it was unusual for him not to answer. She acted concerned according to Agent Ray's testimony. Agent Ray testified that Ms. Fowler mentioned a previous tenant who had lived there who had committed suicide in that same duplex where the Defendant was now residing. She stated to Agent Ray her concerns about the same thing happening here since the Defendant was not answering the knocks on his door nor the calls of the officers into the open windows. Ms. Fowler described for the officers the specific window and area of the Defendant's duplex where his bedroom should be located on the back and side of the house. Detectives Grimmich and Acosta yelled loudly into that window and still received no response.

13.     All three officers then met at the front of the duplex. Detectives Grimmich and Acosta said that they smelled a foul odor coming from inside the area where the open windows were while they were yelling inside. Detective Grimmich stated that he needed to do a welfare check to make sure that the Defendant was okay.

14.     There is a screened porch on the back of the Defendant's duplex. The officers entered that screened porch. Detective Acosta noted that the sliding glass door was ajar and slightly open. The officers once again called out and were knocking. The only noise which was heard was a moaning sound from inside. This was heard by Detective Grimmich and Agent Ray. However, Detective Acosta testified that he did not hear that sound.

15.     Detective Acosta announced who they were and that they were coming inside the residence. He then opened the sliding glass door and noted a bunch of beer cartons piled up. They had to move these to get by and walk into the residence. Still there was no response from anyone inside the residence. The officers entered the kitchen area. Detective Acosta walked down a short hallway and found the Defendant lying nude on an air mattress in the bedroom. Agent Ray testified that he was still in the kitchen area when

Detective Acosta said that he had found the Defendant. Agent Ray testified that he heard Detective Acosta ask the Defendant if he was okay and heard the Defendant reply yes. He also heard the Defendant reply what was going on. Agent Ray went to the hallway area and observed the Defendant lying on an air mattress. The Defendant was starting to get up and get dressed.

16.     When they entered the residence, the officers all had their guns drawn in the "low ready position." They put their guns away when Detective Acosta indicated that the Defendant was okay, undressed, and that there was no fear for their safety. Agent Ray testified that he and the other officers had polo shirts on with badges embroidered on them indicating that they were police officers from particular agencies. Agent Ray had on tan casual slacks. The other detectives were similarly attired with embroidered badges from their particular agency, the Sebastian Police Department, on their polo shirts.

17.     The officers told the Defendant they were there to speak with him about possible child pornography being downloaded or uploaded from this residence. The Defendant said he wanted to talk outside, so all parties exited through the living room to the area outside the front door of the duplex.

18.     Government's Exhibit Nos. 4 through 8 inclusive were pictures of the interior of the Defendant's duplex indicating numerous beer cans and other debris through which the officers and the Defendant had to make their way to get to the front door. Government's Exhibit No. 9 is a photograph of computer equipment, media and related matters which were taken from the Defendant's residence, placed at the front of the residence, and photographed by Agent Ray.

19.     As the Defendant was walking outside, Agent Ray asked Detective Grimmich to get a recorder to record the conversations between the officers and the Defendant. It appears as though the Defendant was not aware that he was being recorded. The record

of these recordings as well as the subsequent interview of the Defendant at the Sebastian Police Department is contained within Government's Exhibit No. 10 admitted into evidence at this hearing. This Court has listened to that CD on several occasions and will review it separately after this Court reviews all of the testimony of the witnesses who testified at this evidentiary hearing.

20.     Once the Defendant was outside with the officers, Agent Ray told the Defendant that they detected child pornography being transmitted from his home. This was not true according to Agent Ray's testimony. He was lying about this and misstating these facts for investigatory purposes. Agent Ray then told the Defendant that he was interested in looking at his computers. The Defendant stated that he did not have any child pornography on his computers. The Defendant further responded and stated that he did have a wireless modem which was secured and password encrypted. He did not believe that anyone had "hacked into" his wireless router/modem.

21.     The Defendant asked Agent Ray when the child pornography had been detected and Agent Ray stated that it was in November of 2009. The Defendant stated that he was not using the laptop seen in the living room in November of 2009. He stated that he was using a different laptop which was now broken and in another part of his duplex. Agent Ray testified that the Defendant then offered to go get the broken laptop. Agent Ray testified that this was approximately four to five minutes into the interview with the Defendant. Agent Ray testified that while the Defendant appeared tired and his eyes were bloodshot, he seemed to be fully aware of what was going on. Agent Ray testified that the Defendant was responsive to all of the questions. He made appropriate and relevant responses to the questions.

22.     The Defendant offered to go get the broken laptop and began walking back into his residence. At the same time he continued to talk with Agent Ray, so the officers

7

all followed the Defendant back into the duplex. Agent Ray had told the Defendant that he wanted to look at everything to exclude the Defendant as being the one who was purportedly downloading child pornography. Agent Ray testified that at no time did the Defendant ask the officers to not re-enter the residence or to follow him. The Defendant retrieved the broken laptop and brought it back into the living room area where the officers had remained.

23.    It was at this time that Agent Ray asked the Defendant if the Defendant had any objection to Agent Ray looking at the laptop on the table in the living room which was apparently open and running at that time. The Defendant said that he had no objection to Agent Ray doing so. Agent Ray's testimony was that the Defendant did not appear to be incoherent or under the influence of anything at that point. The Defendant did not stumble and was even able to navigate the hazards, cans and other debris within the residence without any difficulty.

24.    After the Defendant stated that he had no objection to Agent Ray looking at the laptop which was running on the table in the living room, Agent Ray turned to it and saw several program windows which were open. Agent Ray looked at them and determined that three files with titles he knew to be associated with child pornography were being downloaded and that eight titles he associated with child pornography were being uploaded. His recognition of these various titles was based upon his prior experience involving investigations of child pornography. After he determined that the Defendant's laptop was downloading and uploading child pornography, Agent Ray asked the Defendant where the wireless router was. The Defendant said that it was in his bedroom. Agent Ray stated that he needed to stop the downloading and uploading of these files. Agent Ray did so by pulling the router connection to disconnect it from the internet service provider.

8

25.     Agent Ray returned to the living room and continued to look at the open laptop computer and the files. He continued to discuss these files with the Defendant. The Defendant was not under arrest at this time nor was he handcuffed or restricted in any way. Agent Ray testified that he had told the Defendant that he did not have to speak with them and that he was not under arrest. This was at approximately eleven minutes into the conversation with the Defendant. When the officers stated that they wanted to continue to talk with the Defendant, the Defendant asked if they could go outside so he could smoke a cigarette and where the area was less cluttered than the inside of his residence. Therefore, everyone walked back outside to the front of the Defendant's duplex.

26.     The Defendant denied that he had transferred any child pornography to any other media such as CDs, DVDs, or disks. Agent Ray testified that the Defendant gave oral consent to search the computers and any other media which were found within his residence. These items were then taken outside, lined up on the sidewalk, and photographed as is depicted in Government's Exhibit No. 9. Agent Ray testified that he wanted to further examine these items and the Defendant consented to allow him to take them and search them.

27.     The officers then asked the Defendant if he would voluntarily go to the Sebastian Police Department so they could speak with him further. The Defendant agreed. The Defendant's only concern was that he needed to be back by 2:00 o'clock so he could get to work. The Defendant was not restrained and he was free to go. Agent Ray testified that the Defendant was even free to drive to the police department on his own or ride with them. Other than being back in time for work, the Defendant exhibited no other hesitation and simply rode with one of the other officers to the Sebastian Police Department.

28.     Agent Ray's testimony then centered on the interview at the Sebastian Police Department. During that interview, the Defendant responded appropriately to all questions

9

and did not hesitate. He was not restrained. There were no threats or coercion by any of the officers in attendance during the interview, which was recorded on Government's Exhibit No. 10. The Defendant's Miranda rights were read to him by Agent Ray from a card. Agent Ray did not have the card at this evidentiary hearing. However, he did recite the rights that he recalls reading to the Defendant. They do appear to comply with the requirements of Miranda. The Defendant told Agent Ray that he understood his rights and was still willing to talk with Agent Ray and the other officers.

29.     During the interview at the Sebastian Police Department, Agent Ray told the Defendant that it was verified that there was child pornography on his computer. The Defendant was cooperative throughout the interview. Any time that a break was taken, the Defendant was reminded of his Miranda rights and it was made certain that he was willing to continue to speak with them. There were no threats or coercion used. The substance of the Defendant's statements made during the interview will be reviewed later herein by this Court during the review of the evidence from Government's Exhibit No. 10, which is a CD containing the Defendant's statements and interview.

30.     Agent Ray testified that on August 10, 2010, a Federal search warrant was obtained for the computers and all media listed. Agent Ray testified that the Defendant never withdrew any consents to search his residence nor the personal property seized. Additionally, at no time did the Defendant ever indicate that he wished to stop speaking or wanted to speak with an attorney.

31.     On cross-examination, Agent Ray admitted that he did not have any probable cause to arrest the Defendant at the time that he and the other officers arrived at the Defendant's residence to conduct the "knock and talk" on August 3, 2010. He had no evidence that the Defendant was committing a crime at that time. He had no leads that the Defendant was involved with child pornography aside from the anonymous tip. He testified

10

on cross-examination that the purpose of going to the Defendant's residence was to investigate possible criminal activity. He had no prior information before going to the residence that the Defendant suffered from any medical condition or mental health condition which would require a "welfare check" by the officers entering the Defendant's duplex.

32.     On cross-examination, Agent Ray testified that during the initial knocking on the door, the officers did not identify themselves as police officers. They were just saying hello and knocking. They did so for a minute or more. They first said that they were police officers when a neighbor, Ms. Fowler, asked through her door who it was that was knocking. After receiving no response, Agent Ray decided to knock on the neighbor's door and ask if they knew whether the Defendant was at home.

33.     It was at this point that he first met Ms.Fowler, the neighbor. Agent Ray testified that after receiving information from Ms. Fowler and her concerns that the Defendant may be in distress based upon a previous tenant having committed suicide, he continued to knock on the front door of the Defendant's duplex. Detectives Grimmich and Acosta walked around the unit and yelled into the windows. This continued for another five or six minutes.

34.     On cross-examination, Agent Ray stated that he did hear the moan as they were entering in the porch area. He did not call the fire department or EMTs . He does have some training in first aid or life safety as did the detectives as well. He estimated that there were hundreds of beer cans inside the home which they had to go through to get into the residence. Agent Ray stated that the Defendant was groggy and had bloodshot eyes. He appeared tired.

35.     On re-direct examination, Agent Ray testified that he and the other officers decided to go into the residence to eliminate the reasons why the Defendant may not be

11

responding after speaking with the neighbor, Ms. Fowler. Ms. Fowler appeared visibly shaken as she answered her door and could not understand why the Defendant was not responding if his windows were open and his car was there. The Defendant never told the officers that he was "sleep deprived" nor did he make any other complaints about being drunk or otherwise under the influence. At no time did the Defendant tell any of the officers that he did not understand what they were asking or what was going on. Agent Ray testified on re-direct examination that he did not touch nor look at any computers until the Defendant had given his oral consent.

_____

## Darlene Fowler

36.    Ms. Fowler testified that she is the Defendant's neighbor in the adjoining duplex.  She has known the Defendant for approximately two years.  She identified the Defendant in open court.

37.    When she heard the constant knocking on the door, she thought it might have been her door and asked who it was.  The response was that it was the police, but not looking for her.  She then opened the door to her residence and saw it was the police. She spoke with Agent Ray who she identified in court.  Agent Ray told her that they could not discuss why they were there, but he wanted to know if she had any idea if her neighbor was home. Ms. Fowler testified that she looked out and saw the Defendant's car there and the duplex windows were open. She told Agent Ray that if the car was there and windows open he had to be home.  She testified that she had seen the Defendant the previous evening.  She also knew that the Defendant worked during the day.

38.    Ms. Fowler testified that she told Agent Ray that she was concerned if the Defendant was not responding or answering the knocks.  She told Agent Ray that she felt

12

something is wrong if he was not responding. She testified that she had been sleeping and that the knocks on the Defendant's door woke her up where she was sleeping in her bedroom. She estimated that the knocking had gone on five to ten minutes before she responded.

39.     Ms. Fowler testified that an individual who previously lived in the Defendant's part of the duplex had committed suicide and that this had just "run through her mind." She testified that she told Agent Ray of her concerns that the Defendant may have also committed suicide. She testified that she then asked the officers to find out if he was okay and pointed out exactly where the Defendant's bedroom was located within his portion of the duplex. She stayed in the front part of her duplex.

40.     She gave a statement to the Sebastian Police Department, a copy of which was admitted at this hearing as Defendant's Exhibit No. 1. This Court has reviewed the statement given by Ms. Fowler to the Sebastian Police Department on August 3, 2010. It does not list every statement she made while testifying. However, it does succinctly set forth her concerns about the Defendant having maybe committed suicide and not understanding why he was not responding to the knocks by the police. There is nothing contained within Defendant's Exhibit No. 1 which this Court can find which conflicts in any way with the testimony given by Ms. Fowler at this hearing.

Detective Bill Grimmich - Sebastian Police Department

41.     Detective Grimmich was the next witness called by the government. He has been working for the Sebastian Police Department for twenty-two years. He has previous experience in road patrol and as a road patrol supervisor. He has also been a training officer for that agency. His background as stated on the record includes previous DUI

13

arrests and observing individuals who have been under the influence of alcohol or narcotics.

42.    He testified about the anonymous tip received by Treasure Coast Crime Stoppers in October of 2009. There is not much testimony concerning the investigation leading up to the "knock and talk" on August 3, 2010.

43.    On August 3, 2010, he and Detective Acosta of his agency accompanied Agent Ray to the Defendant's residence. They knocked a few times without any success. He specifically knocked on the windows around the residence. He noted that all the windows were open. He yelled through the open windows saying "Mr. Smith - police department."

44.    He related that Ms. Fowler told them that if the Defendant's car was there and the windows open, that the Defendant should be in the residence. She further informed the officers of the suicide by a previous tenant and indicated she was concerned that the Defendant was in some sort of distress.

45.    Detective Grimmich went to the back of the residence and smelled a foul odor coming from inside the Defendant's portion of the duplex. Detective Acosta stated that the glass door on the back of the residence was ajar. It was a very hot day and Detective Grimmich found it unusual for a person with air conditioning to have their windows open and door ajar. These facts furthered his suspicion that something may be wrong and that they needed to check on the resident inside.

46.    The officers entered the screened porch in the back and then opened the sliding glass door which was partially opened already. As they first began entering the kitchen area, Detective Grimmich heard a moan from inside the residence. Since they had been knocking and yelling loudly for quite some time, he believed maybe someone inside needed aid. All of the blinds had been drawn and he was not able to see inside any of the

14

windows. Agent Ray told Detective Grimmich he also heard the moan. Detective Acosta did not hear it at the same time. They all then entered the kitchen area.

47. Detective Acosta went to a hallway area and was heard saying "I got him." Detective Grimmich overheard Agent Ray ask if the person was okay and Detective Acosta responded that he thought so. Detective Grimmich then went to the area and saw the Defendant lying nude on an air mattress in a bedroom. Once eye contact had been made by the Defendant with the officers, none of them felt threatened. All of their guns were then put away.

48. Detective Grimmich testified that he was wearing a pair of cargo pants and a polo shirt with an embroidered emblem of the Sebastian Police Department. The other officers were similarly dressed. Detective Grimmich told the Defendant that they were the police department and would like to speak with him. The Defendant asked if he could get dressed and go outside. The Defendant said he was embarrassed by the condition of his residence. They all then went out front.

49. Detective Grimmich got a recorder from his vehicle to record any statements and conversations made between the Defendant and the officers. Detective Grimmich identified the Defendant in court as the person who was talking and whose conversations were recorded. This recording is contained on Government's Exhibit No. 10 as referenced previously by this Court.

50. Detective Grimmich testified that the Defendant did not appear to be under the influence of alcohol or narcotics. The Defendant had no apparent problems understanding what was going on or the questions asked of him. The Defendant made no complaints of physical or mental problems. The Defendant was cooperative throughout and was speaking in a normal conversational tone.

51.    Detective Grimmich was present when Agent Ray asked the Defendant if he could look at the computer after explaining that they were there to investigate the downloading of child pornography. Detective Grimmich overheard the Defendant say that he had no problem with Agent Ray examining the computer. The Defendant also said they could look at the old one and the new one.

52.    As the Defendant re-entered his duplex to retrieve his broken laptop computer, the officers followed him inside. The Defendant kept speaking and was apologizing for the conditions of his apartment. The Defendant had no problems walking or navigating through the debris inside which is depicted in the photographs admitted into evidence in this case. At no time did the Defendant say that he wanted to stop talking or that he did not wish for the officers to view his computers.

53.    It was Detective Grimmich who asked the Defendant to sign a written Consent To Search. He testified that he explained the written Consent To Search to the Defendant and the Defendant indicated that he had no problem in signing the consent. Government's Exhibit No. 3 admitted into evidence at this hearing is the written Consent To Search form signed by the Defendant according to Detective Grimmich's testimony. It is noted that the consent form appears to have been signed by the Defendant and witnessed by Detective Acosta. The consent form described the residence as a concrete duplex, tan/beige in color with two bedrooms and one bath. It gave the address of the Defendant's residence and the date of the search. Specifically this Court notes that the written consent states that "I give this consent voluntarily with no promises nor threats being made to me and without favor or reward. It is also understood that I could refuse or terminate this search at any time." Detective Grimmich testified that the Defendant had already given oral consent to search the computers, media and duplex and that the written consent was simply a confirmation of this previously given oral consent.

16

54.     Detective Grimmich recalls also telling the Defendant that he did not have to speak with the officers if he did not wish to do so. He was the one who asked the Defendant if he would come to the Sebastian Police Department to speak with them further about this matter. The Defendant was told that he could take his own car or ride in a police car. The Defendant told the officers that he would go along with them as long as he could get back by 2:00 o'clock that afternoon for work.

55.     Detective Grimmich observed the Defendant's demeanor while Agent Ray was examining the computers and speaking with the Defendant. Detective Grimmich testified that the Defendant's demeanor was good and that the conversation between he and Agent Ray was normal. At the Sebastian Police Department, the Defendant remained cooperative and did not appear as though he had any problems with any of the questions asked by the officers.

56.     On cross-examination, Detective Grimmich testified that he recalls the neighbor, Ms. Fowler, indicating that she thought the Defendant was depressed and may have hurt himself. He admitted that he did not put this in his report even though he agreed it would have been an important factor to place within his written report.

57.     On further cross-examination, he stated that he only heard the moaning from inside the residence after Detective Acosta had fully opened the sliding glass door further. There had been no consent by the Defendant to enter the residence at that point. After locating the Defendant, he does not recall anyone telling the Defendant that the Defendant could ask them all to leave or did not have to speak with them.

58.     On re-direct examination, Detective Grimmich testified that his written report had just been completed the day previous to this evidentiary hearing which is over a month after the events had occurred. While he may have left out some mention of the neighbor's

17

concern about the Defendant being depressed, he did not intend for his report to be all inclusive as to everything that took place on August 3, 2010.

_____

## Detective Daniel Acosta - Sebastian Police Department

59.     Detective Acosta testified that he has been with the Sebastian Police Department since 1999. This includes road patrol duties and the detective bureau. He has had training concerning arresting people who are under the influence of drugs or alcohol.

60.     Detective Acosta testified that he went to the duplex along with Detective Grimmich and Agent Ray. He observed all the windows open. He was yelling into every window at the residence trying to get Mr. Smith to come to the door. This was unsuccessful. They were announcing that they were police. It was at this time that he told the other officers that he observed the back sliding glass door ajar and partially open. He could smell a foul odor coming from the windows of the duplex.

61.     The officers then entered the screened porch area in the back and began to open the sliding door. As Detective Acosta started to open the glass door, he heard Detective Grimmich ask the others if they had heard a noise as the glass door was opened. Detective Acosta said that he did not. The officers then entered the kitchen area. Detective Acosta went to a hallway area by the bedrooms and found the Defendant lying nude on an air mattress with one eye open looking at him. Detective Acosta then said "I got him" and told the other officers that he believed that the Defendant was okay. Agent Ray then came to the area and told the Defendant that they were law enforcement officers and asked if he would speak with them. The Defendant stated that he was embarrassed and said "sure, I'll speak" but asked if he could get some clothes on. He was allowed to do so. Agent Ray asked where he would prefer speaking with them and the Defendant indicated outside the front door.

62.     Detective Acosta testified that there were no threats or yelling by anyone. Their guns were put away as soon as they were able to determine that the Defendant was nude and was not capable of reaching for a weapon of any type. He testified that he was present off and on as Agent Ray was speaking with the Defendant. He never heard anyone raise any voices nor threaten the Defendant. He was not present when the others spoke with the neighbor, Ms. Fowler. He was on the side or rear of the Defendant's residence at that time.

63.     On cross-examination, Detective Acosta testified that he is familiar with the smell of a decomposing body and that the odor he smelled coming from the residence was very similar, but not the same. When Ms. Rosen-Evans stated on the record that it was later determined to be feces smell emanating from inside the residence, Detective Acosta said that the smell was similar.

64.     Detective Acosta testified that he did not recall exactly what he said to the Defendant when he first found him lying on the air mattress. He did state that Agent Ray or Detective Grimmich had said that they were going into the house even before entering the back porch area and hearing the moan.

65.     On re-direct examination, Detective Acosta testified he did not know what the foul odor was. It did cross his mind at the time that it could have been a decomposing body. He found out later that it was merely a filthy residence. The decision by the officers to conduct a "welfare check" of the resident inside the duplex was made only after Detective Grimmich and Agent Ray had spoken with the neighbor, Ms. Fowler.

_____

66.     The Defendant presented no witnesses at the evidentiary hearing. However, Ms. Rosen-Evans did move into evidence Defendant's Exhibit No. 1 which was admitted

19

without objection. This Court has referred to that exhibit previously. It is the written statement made by the neighbor, Ms. Fowler, to the Sebastian Police Department on August 3, 2010.

_____

### Government's Exhibit No. 10 - CD Recording of Defendant's Statements

67.     Government's Exhibit No. 10 is a compact disk which contains the surreptitious recording of the Defendant speaking with Agent Ray and the other officers at the Defendant's home on August 3, 2010. The exhibit also contains the interview of the Defendant at the Sebastian Police Department that same date. This Court has listened to this compact disk and will recite the excerpts from the exhibit which this Court feels are pertinent to the issues raised by the Defendant's motion.

68.     The recording begins with Agent Ray and Detective Grimmich interviewing the Defendant outside his home on August 3, 2010. Agent Ray is heard telling the Defendant that they received information that child pornography was on a computer at this residence. The Defendant is heard denying having any child pornography and says that he is computer knowledgeable. The Defendant states that he is running a password secure wireless router. When asked by the Defendant, Agent Ray says that the "child pornography hit" was sometime in November 2009.

69.     The Defendant is overheard telling Agent Ray that he did not have the computer in the living room back in November 2009. He stated that there is another one which is "dead" and that Agent Ray can look at it. The Defendant is then heard saying "let me get you the old one." One can hear on the compact disk beer cans being hit and knocked about the duplex as the Defendant walks to the area to retrieve the old broken laptop.

20

70.     Agent Ray asks the Defendant if they can look at the open laptop computer which is running on the living room table and that it would be good if they could exclude him as being the person who purportedly was downloading child pornography at this residence. It cannot be heard exactly what the Defendant says in response until the Defendant is heard saying "that's fine" after the beer can noise stops.

71.     Agent Ray is heard noting that the open laptop is running an application at that time and Agent Ray says that it indicates that it is open with suspected child pornography. Agent Ray states that the computer is currently downloading known child pornography titles which Agent Ray knows from previous investigations as well as uploading files of child pornography with titles associated with child pornography.

72.     After it appears as though it is confirmed that child pornography is being both downloaded and uploaded from this laptop computer, Agent Ray is heard saying that he needed to disconnect it to stop those downloads and uploads. He then goes to the bedroom area and disconnects the router shown to him by the Defendant.

73.     Detective Grimmich is heard saying that based upon indicators that they have found in the open laptop, they are going to stay there to get to the bottom of it. The Defendant is heard saying that he downloads all kinds of "stuff" including music. The Defendant is heard saying that he knew he was sharing those files that he downloads.

74.     Agent Ray states that he was looking into the computer hard drive in that laptop and said it looks as though there are videos and photos with child pornographic titles. The Defendant stated that he keeps regular movies in another area and does not share those with anyone else. The Defendant stated that he only downloads child pornography and has not purchased any child pornography. The Defendant stated that he is always intimidated by the police.

21

75. This Court notes that up to this point of the conversation and, in fact, in all subsequent conversations which this Court will relate herein, it is readily apparent that no threats or coercion are being utilized by any of the officers involved. No voices are raised nor threats made. The Defendant does not appear to be under the influence of any alcohol or drugs. The Defendant sounds aware and responsive to all questions asked. His speech is not slurred. He never asked for a question to be repeated nor did it appear as though he was attempting to give evasive answers. He was very straightforward and cooperative during all of the interviews contained within this exhibit.

76. When asked, the Defendant gave Agent Ray the main password to get into the laptop computer which was running at that time. It was approximately eleven minutes into this interview on Government's Exhibit No. 10 at this point when the Defendant was told he was not under arrest and did not have to talk with the officers. The Defendant is heard saying, "yeah, okay, right." When asked about speaking further with the officers, the Defendant said he would prefer going outside so he could smoke a cigarette and the officers said that was fine with them. The Defendant is later heard saying that he was handing Agent Ray the broken computer so they could look at it. All individuals then go outside.

77. In response to questions by Agent Ray, the Defendant said that he had not been downloading child pornography long. He estimated less than a year. The Defendant said he chose to share child pornography because he just did not pull it out as he did with other files he downloaded to prevent sharing.

78. When Agent Ray asked if he could access the Defendant's Yahoo chat room account, the Defendant told him to "go right ahead." Agent Ray stated he was doing this to make certain that the Defendant was not talking with children. The Defendant gave all of his password and screen name information to Agent Ray. Agent Ray was also

overheard discussing the compact disk and other media that the Defendant had in his residence. The Defendant said that he had no objection to them taking these to be examined as well.

79.     Detective Grimmich is heard telling the Defendant that his neighbor was worried that he may have hurt himself after they were not able to get an answer to their banging. The Defendant said that he was not hurting himself and he was just "out." While the Defendant does not explain what "out" means, this Court assumes it to mean that he was asleep.

80.     At approximately forty-five and one-half minutes into the interview at the Defendant's residence, Detective Grimmich presented the written Consent To Search Form for the Defendant's review. This has been admitted into evidence at this hearing as Government's Exhibit No. 3. Detective Grimmich is heard telling the Defendant that it covers them for having been walking in and out of the house and taking certain items to which the Defendant had previously given his oral consent. Detective Grimmich is heard telling the Defendant that they would like him to sign it. Detective Grimmich says that the Defendant is cooperating and letting them search. Detective Grimmich is heard telling the Defendant to carefully read the written Consent To Search and if he has no problem, to sign it. The Defendant is heard doing so. Once again there are no sounds of threats, coercion, rapid-fire questioning or anything else which would be associated with anything other than a normal conversation.

81.     It is at this point that the Defendant is asked to voluntarily come to the Sebastian Police Department and that the officers would like to talk with the Defendant about how these things got on his computer. In asking the Defendant, they used the word "volunteer" twice in respect to coming down to give them a statement. The officers also

23

told the Defendant that they wanted to look at the hard drive and have him answer any questions they may have had after reviewing the hard drive.

82.     The Defendant is heard being asked if he would like to come down and talk with them. The Defendant is heard saying "yes absolutely." The officers tell the Defendant that they would prefer to give him a ride or let him drive. One of the officers is overheard on the tape saying that they would rather not let him drive. The Defendant's only hesitation was that he hoped to be back at the house in time for him to go to work that afternoon. It is at this point that the parties leave the residence.

_____

83.     The next part of the Defendant's statements on Government's Exhibit No. 10 are all at the Sebastian Police Department. There are three thirty minute segments listed on the compact disk. They are not all filled with questions and answers. There is a great deal of dead air and space which this Court assumes was when individuals were out of the room reviewing pieces of evidence. However, this Court will recite what was heard and what was audible from the three separate interview recordings at the Sebastian Police Department.

84.     Agent Ray is heard advising the Defendant of his Miranda rights. These rights as recited by Agent Ray do appear to comply with the requirements of Miranda. The Defendant is heard saying that he understood his rights and agreed to talk with the officers.

85.     Agent Ray is heard telling the Defendant that he pulled the hard drive from the working laptop and hooked it up to review. The Defendant told Agent Ray certain words and terms that he used to search for child pornography. The Defendant stated that he first came upon child pornography by mistake, watched it and got curious. Thereafter

24

he kept searching for it. He told the officers that over a period of time he has had three laptops.

86.     Agent Ray asked the Defendant if he had any questions of them. The Defendant asked if he was going home that day. Agent Ray is heard telling him that he would have to check with other officers about that. This Court notes that the third thirty minute segment on the compact disk contained no audible conversations or words for this Court to review.

87.     Once again, there were no audible threats or coercion during the interviews with the Defendant. There was no rapid-fire questioning nor other techniques which would appear to this Court to confuse the Defendant or violate his constitutional rights. The conversation at the Sebastian Police Department interview room was just as conversational and cordial between the Defendant and the officers as was the conversation recorded at the Defendant's residence. The Defendant does not appear to be groggy, tired, or under the influence of any substance. The Defendant does not at any time sound confused. The Defendant at no time asked for a question to be repeated nor did he give any answer which seemed to be evasive. The Defendant never requested an attorney or said that he wished to stop talking with the officers.

## ANALYSIS

88.     The Defendant argues that the initial entry into his residence was illegal and therefore all evidence flowing from that illegal entry should be suppressed as fruit of the poisonous tree. This includes the items seized and examined pursuant to the search warrant issued by this Court. The Defendant makes no specific objection to the affidavit submitted in support of the application for search warrant or the search warrant itself. The Defendant's argument to suppress the search warrant based upon the fact that the basis

for probable cause flowed directly from what the Defendant argues were illegally obtained evidence during the warrantless search of the Defendant's duplex and personal property.

89. The Defendant argues that there were no exigent circumstances justifying the officers' initial entry into the home and no probable cause. Further, the Defendant argued in the motion and at the conclusion of the hearing that there was no dissipation of the illegal entry and that any consent which may have been given by the Defendant, either orally or written, was tainted by the illegal entry. The Defendant argues that such consents cannot be the product of illegality. Finally, the Defendant argues that he did not voluntarily consent to speak with the officers nor did he voluntarily consent to a search of his residence. The Defendant argues that any such consent was merely a submission to the authority of the officers.

90. The investigative technique which was referred to during the testimony as "knock and talk" is a valid investigatory technique which is recognized by the courts. Consents, if validly given, during such a "knock and talk" are permitted. The consent must be valid under the applicable standard, which this Court will review later herein. However, as an initial matter, the right of the officers to conduct a "knock and talk" to follow up on the anonymous tip which was provided in this case to law enforcement, is a valid and recognized investigative technique. United States v. Lowry, 315 Fed. Appx. 214 (11th Cir. 2008) and United States v. Taylor, 458 F.3d 1201 (11th Cir. 2006).

91. This Court next examines whether or not the officers had sufficient information to justify entry into the Defendant's home under the exigent circumstances exception to the search warrant requirements of the Fourth Amendment. The basic principle of the Fourth Amendment is that searches and seizures inside a home without a warrant are presumptively unreasonable. United States v. McGough, 412 F.3d 1232 (11th Cir. 2005). Certain exceptions to that rule would be when a defendant executes a valid

consent to search or when exigent circumstances exist to justify the officers' initial entry into the home.

92.    To justify entry into the Defendant's home as an emergency and therefore an exigent circumstance, the government must demonstrate exigency and probable cause. The probable cause element for such an entry in response to a purported exigent circumstance may be satisfied where the officers at the scene reasonably believed a person is in danger. United States v. Holloway, 290 F.3d 1331 (11th Cir. 2002). In this case, the officers were banging loudly on the front door and yelling through open windows at the Defendant's residence for several minutes. The knocking and banging was loud enough to wake up the neighbor, Ms. Fowler, who was asleep at the time. After Agent Ray told Ms. Fowler that they were there to speak with the Defendant, she exhibited concerns about the Defendant's well being. Ms. Fowler testified at this hearing that she did, in fact, tell Agent Ray that a previous tenant had committed suicide in that residence and that she was concerned about the Defendant's well being and that he may have done the same thing. Specifically, Ms. Fowler testified at the hearing that she asked the agents to check on the Defendant. It is clear that she did ask the officers on the scene to check on the Defendant and she told them that it was unusual for his car to be parked there as it was and the windows to be open and he not be at home. She believed that those were indicators that the Defendant was in the residence. She did not understand why he was not responding to the loud knocking and yelling by the officers.

93.    With this information within their framework of knowledge, the officers kept yelling through the windows to attempt to raise the Defendant. The evidence is also clear that the officers had intended to enter the residence even before they walked into the screened porch at the rear of the residence. In the back porch area, a sliding glass door was found ajar. As the sliding glass door was being opened, Agent Ray and Detective

Grimmich heard what they believed was a moaning sound come from within the residence. Detective Acosta said that he did not hear that sound. This Court points out that this is after the officers had smelled a foul odor emanating from the Defendant's residence. Detective Acosta associated this odor with possibly being associated with a decomposing body.

94.     The officers then enter the residence and find the Defendant lying on an air mattress in a bedroom. It was quickly determined that the Defendant did not have a weapon and the officers' weapons were immediately put away. Based upon the totality of the circumstances involving the officers knocking on the door, yelling through the windows, a foul smell coming from the residence, a moaning sound, and the specific statements made by Ms. Fowler, this Court finds that the officers acted reasonably in entering the Defendant's residence to determine if he was in distress. See McGough, supra, and United States v. Ackerman, 2006 WL 224028 (M.D. Fla. 2006).

95.     The evidence establishes that once inside the home, the officers identified themselves again even though they had been yelling "police officers" while knocking on the door and yelling through the windows. The officers then told the Defendant that they wished to speak with him. The Defendant indicated that he was willing to speak with them. The officers asked where he would want to speak and he indicated that he would prefer to speak outside. Thereupon all of the officers and the Defendant removed themselves outside the front door. Based upon the evidence received by this Court, this appears to have been done in a very quick fashion. There was no search of the residence while the officers were inside. It appears to this Court that as soon as the officers were able to dispel their fears that the Defendant was in distress, they immediately withdrew from the residence after the Defendant said he would speak with them outside.

96.     This Court views this as similar to a protective sweep of a residence wherein officers are permitted to make a protective sweep under certain circumstances.  Once the protective sweep is completed and there is no longer any suspicion of danger, the officers should depart the premises.  United States v. Delancy, 502 F.3d 1297 (11th Cir. 2007).  In Delancy, there was an arrest of a resident outside.  The officers then entered the residence for the purposes of conducting a protective sweep.  While inside, another resident was encountered by the officers.  Approximately ten to twenty minutes after the initial protective sweep, the resident inside gave written consent to search the residence.  The Eleventh Circuit found that the resident's consent to search her home was not tainted by an illegal protective sweep of the home conducted prior to the consent where the officers spoke with the homeowner for ten to twenty minutes after the sweep before obtaining a consent.  The Court noted that the interaction between the police officers and the homeowner was conversational in tone and that there were no threats made to the homeowner.  The homeowner was not handcuffed nor detained.  The homeowner was permitted to review and sign a consent form which notified her of her constitutional rights to refuse the consent.  Further, the Eleventh Circuit found that the actions of the officers were not a subterfuge concocted to give authorities a justification to enter the residence and obtain consent to search the residence.

97.     This Court references the Delancy case since it appears as though the Eleventh Circuit believed that a ten to twenty minute delay in either leaving the residence or obtaining consent may have made the initial protective sweep illegal.  The Eleventh Circuit pointed out that as soon as the purposes of the protective sweep resulted in no finding of any danger, the officers should have withdrawn.  Nevertheless, the Court found that the initial illegal entry into the residence did not taint a later consent under the particular facts and circumstances of that case.

98.     Based upon all of the testimony presented as well as the statements recorded on Government's Exhibit No. 10, this Court finds that there was never any coercive techniques nor threats made by any of the officers towards the Defendant in this case. All of the conversations between the Defendant and the officers were conversational in nature just as they were in Delancy. The Defendant was not handcuffed, detained, restrained or threatened. The officers did not have their guns out once it was determined that the Defendant in this case was not armed. Therefore, all of the evidence in this case points to a very similar set of facts as was addressed by the Eleventh Circuit in Delancy.

99.     Once the officers removed themselves to the front of the residence, they continued to speak with the Defendant. This Court disagrees with the Defendant's assertion that he has a constitutional right to be advised at that time he did not have to speak with the officers. The Defendant was not under arrest and the officers testified that they did not have probable cause at that time to believe that a crime was being committed. They were there for the purposes of further investigation of the anonymous tip which had been given to law enforcement.

100.    This Court also must address the "trickery" or "lie" which Agent Ray told to the Defendant at the very beginning of their conversation. Agent Ray told the Defendant that law enforcement had received a "hit" that child pornography had been downloaded at the Defendant's address. This was not true. However, this Court finds that the totality of the circumstances surrounding that "trickery" did not otherwise affect the Defendant's ability to voluntarily consent to speak with the officers and consent to the search of his residence. The Eleventh Circuit has rejected a per se rule that statements obtained by police deception must be suppressed. United States v. Farley, 607 F.3d 1294 (11th Cir. 2010). The Court in Farley stated that unlike physical violence or the threat of it which makes any resulting statement by a defendant per se involuntary, the effect of

30

psychological pressure or deception on the voluntariness of a statement depends on the particular circumstances in each case. Misleading a suspect about the existence or strength of evidence against him does not by itself make his statement involuntary. The Court went on to state that even if some police tricks may be objectionable as a matter of ethics, they are not relevant to the constitutional validity of a defendant's waiver of his privilege against self-incrimination unless they interfere with the defendant's ability to understand the nature of his rights and the consequences of abandoning them. Based upon the totality of the evidence as recited by this Court herein, this Court finds that the "lie" or "trickery" employed by Agent Ray did not affect the Defendant's ability to understand his constitutional rights and make a knowing and voluntary waiver of those rights in agreeing to speak with the officers at the scene and later at the Sebastian Police Department after he was advised of his Miranda rights.

101.    This Court finds the length of time between the original anonymous tip and the actual knock and talk does not affect this Court's ruling in any way. Some ten months expired between the initial anonymous tip and the time when the officers went to conduct the knock and talk in August of 2010. The officers admitted in their testimony at this hearing that they did not have probable cause. They tried other investigative techniques which did not uncover any illegal activity on the part of the Defendant. A time period did elapse while Agent Ray was involved with other cases and out of town. This Court finds no correlation between the Defendant's request to suppress the evidence in this case and the lapse of time between the initial anonymous tip and the knock and talk. This is not a case where the anonymous tip is being utilized as probable cause to obtain a warrant or to conduct a search. The officers testified they did not have probable cause and merely wanted to speak with the Defendant to determine whether or not the anonymous tip justified any further investigation.

31

102. At no time during the investigation did the Defendant ever indicate that he wanted to speak with an attorney or stop talking to any of the officers. While outside the residence, Agent Ray told the Defendant that they were interested in looking at his computers. The Defendant stated that he did not have any child pornography on his computers and offered to get one of his laptops which was broken to show to Agent Ray. As the Defendant was walking into the residence, he continued to speak with the officers and they followed him in while he was retrieving the broken laptop. At no time did the Defendant request the officers to remove themselves from the residence nor follow him into the residence.

103. As the Defendant brought the broken laptop to Agent Ray, Agent Ray asked if the laptop which was open and running in the living room could be reviewed by him. The Defendant responded that he had no objection to Agent Ray doing so. This is some four to five minutes after the Defendant had gotten up, got dressed and went outside to speak with the officers.

104. As the testimony indicates, Agent Ray then determined that there was child pornography being downloaded and uploaded on that computer. The conversations continued inside the Defendant's residence between Agent Ray, the Defendant and the other officers. The recording of these conversations as memorialized on Government's Exhibit No. 10, do not indicate any threats or coercion. The Defendant sounds responsive. The Defendant does not sound as though he is under the influence of any alcohol despite the inordinate amount of beer cans strewn about his apartment as reflected in the exhibits admitted into evidence. Further, the Defendant does not appear to be tired, groggy or under the influence of any other substance. There has been no evidence presented to this Court to even suggest such incapacity on the part of the Defendant during the time that he

had orally consented to speak with the officers and allowed them to search his duplex and computers.

105. The Defendant's consent to speak with the officers was voluntary. There is no evidence to suggest otherwise. The Defendant was not in custody and this Court finds that under the totality of the circumstances, there was no reason for the Defendant to be given his Miranda rights at the time he was being interviewed and questioned at his residence. He was not in custody, not detained, and was free to go according to the testimony received by this Court. In fact, Agent Ray's testimony was that as he was looking at the open and running laptop in the living room, he told the Defendant that he did not have to speak with them and that he was not under arrest. When the officers said that they wanted to continue the conversation after seeing what appeared to be child pornography on the Defendant's computer, the Defendant asked if they could step outside so he could smoke a cigarette. Clearly, the Defendant was not in custody and not entitled to Miranda or any of the rights associated with Miranda at that time. United States v. Luna-Encinas, 603 F.3d 876 (11th Cir. 2010).

106. In respect to the Defendant's consent to search his residence, this Court must determine if it was a valid consent. As stated previously, there was no evidence presented to this Court that the Defendant was under the influence of alcohol and/or a controlled substance. The only mention of this is by way of argument in the Defendant's motion. The evidence recited by this Court establishes that the Defendant gave oral consent to the officers to search his residence and that this consent was later memorialized by a written consent form which has been admitted into evidence at the hearing. The Defendant argues that he was not advised orally of his right to refuse to consent.

33

107. Relevant factors to be considered by the Court in analyzing the Defendant's consent are whether the person was in custody, the exercise of coercion, the person's awareness of their right to refuse to consent, the person's education/intelligence, and whether the person believes incriminating evidence will be found. United States v. Brumfield, 352 Fed. Appx. 366 (11th Cir. 2009). Using these factors, the Defendant was not in custody and there is no evidence of any coercion. Government Exhibit No. 10 is a contemporaneous recording of all of the statements to corroborate the testimony of the officers. The Defendant was not orally advised of his right to refuse. However, that is only one of the relevant factors which this Court can consider and is not determinative of whether or not there was an otherwise valid consent. Ohio v. Robinette, 117 S.Ct. 417 (1996) and United States v. Bentley, 151 Fed. Appx. 824 (11th Cir. 2005). Further, the Defendant appears to be educated and intelligent. The evidence was that he worked at a CVS pharmacy in Vero Beach. His conversations heard by this Court on Government's Exhibit No. 10 reflect an individual who appears to be intelligent, educated and well aware of his surroundings. Further, the Defendant readily admitted that he had child pornography on his computers once it was shown to him by Agent Ray. Under all of the relevant factors referenced by this Court above, this Court finds that the Defendant's oral consent to speak with the officers and to search his residence was valid.

108. The written consent which was admitted into evidence as Government's Exhibit No. 3, specifically states that there were no promises or threats being made to get the Defendant to sign the consent. Further, the consent form specifically states that the Defendant could refuse or terminate the search at any time. The testimony and the statements on Government's Exhibit No. 10 corroborate the fact that the Defendant was told to review the written consent carefully and if he agreed to sign it he could do so. All of the relevant factors which this Court has reviewed from the Robinette and Bentley

34

decisions apply equally to the execution of the written consent. This Court finds that the written consent which memorializes the previously given oral consent was not the product of any coercion or threats. It was voluntarily given after full knowledge. Further, this Court finds that the consents, both oral and written, were not mere submissions to claims of lawful authority as argued by the Defendant. See Brumfield, supra.

109. Based upon the foregoing, the evidence establishes that the officers were legally entitled to enter the Defendant's residence based upon valid concerns for his safety. Once inside, they asked if he would speak with them. The Defendant agreed to do so and everyone immediately moved outside after the Defendant was dressed. The Defendant consented to speak with the officers and even volunteered to obtain his broken laptop to give to them for review. While following the Defendant into residence and continuing in conversation with the Defendant, the working laptop was observed. The Defendant further gave oral consents to search that laptop as well as the broken laptop and other media within his home as the evidence reflects. The Defendant continued to speak with the officers and was not under any restraint, detention, arrest, handcuffing or intimidation. His conversations at his residence appear to this Court to have been voluntarily made. He did not appear to be under the influence of any substance nor groggy as was alleged in the pleadings.

110. This brings the Court to the statements made at the Sebastian Police Department. The record reflects the Defendant was advised of his Miranda rights as reflected on Government's Exhibit No. 10. The Defendant stated that he understood his rights and agreed to speak with law enforcement. In the recording, there are no threats, coercive techniques or intimidation by any of the officers towards the Defendant. The Miranda rights related to the Defendant as reflected on Government's Exhibit No. 10 appear to this Court to comply with the requirements of Miranda. The Defendant's

statements made thereafter were freely and voluntarily given. Under the totality of the circumstances, this Court finds that those statements are likewise admissible. United States v. Chancellor, 2008 WL 622937 (S.D. Fla. 2008).

111.   Alternatively, should the District Court disagree with this Court's findings and conclusions of the initial entry of the officers into the Defendant's residence, this Court must examine whether or not the Defendant's consents were tainted by the alleged illegal initial entry into the home or if the evidence purges any such taint under the applicable case law. As this Court referred to previously in the Delancy decision, the Eleventh Circuit addressed such an issue where there was a protective sweep of a residence which lasted longer than the Eleventh Circuit felt was necessary. The Eleventh Circuit stated that a protective sweep last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.

112.   In this case, the officers entered the residence and immediately found the Defendant Smith lying nude on an air mattress. Once it was determined that he was not armed, the officers put away their weapons. They informed the Defendant that they wished to speak with him and then everyone removed themselves outside the residence. This appears to this Court to be a reasonable action by the officers. They did not search the residence or otherwise look around the residence to further extend their time within the residence. Once it was determined that the Defendant was not in distress and agreed to speak with them, everyone walked outside. It was thereafter that the Defendant consented to speak with the officers further and orally consented to a search of his residence. The written consent, which memorialized the previous oral consent to search, was signed approximately forty-five minutes after everyone had removed themselves outside the front of the Defendant's residence.

113. Government's Exhibit No. 10 reflects that four to five minutes after the parties stepped outside and began talking the Defendant is heard voluntarily offering to retrieve his broken laptop. It was also at this time that he consented to Agent Ray examining the working laptop on the living room table. Approximately eleven minutes into the conversation, Agent ray is heard telling the Defendant that he was not under arrest and did not have to talk with them.

114. To determine whether or not a consent was sufficiently an act of free will to purge any primary taint of an unlawful invasion, the Court must examine three non-exclusive factors. These factors are examined to determine whether or not the consent was tainted by prior illegal conduct. See United States v. Myers, 335 Fed. Appx. 936 (11th Cir. 2009). The Myers court takes their guidance from the Eleventh Circuit's decision in Delancy referenced by this Court previously.

115. The first factor that the Court looks to is the temporal proximity of the consent to the illegal conduct. In this case, the Defendant Smith was outside speaking with the officers some four to five minutes after getting up and offered to go get his broken laptop to give to the officers. It was during this period of time that he was also asked by Agent Ray if the working laptop could be examined. The Defendant said that Agent Ray could do so. In Delancy there was a ten to twenty minute delay from the time of the initial entry until the consents were given. In the Myers case, there was an approximate ten minute delay. This Court finds that the time periods involved in this case may be a short temporal proximity as the Myers court referred to. However, just as the Court in Myers stated, such short temporal proximity is softened because the suspect who consented to the search had not been handcuffed or detained and the officers were polite and non-threatening. This is exactly the situation in this case before the Court. Therefore, this Court finds the first relevant factor to not have tainted the Defendant's subsequent consents.

116. The second factor as delineated by the Eleventh Circuit in Myers and Delancy are any intervening circumstances. The Myers court found that the second factor strongly worked against finding any taint to the defendant's consent because the defendant in Myers had reviewed and signed a consent form which advised her of her constitutional rights. The court in Myers held that such a thorough notification of the Defendant's constitutional rights under the Fourth Amendment is an important intervening circumstance between an illegal search and her consent. The same can be said to apply in this case. The oral consent to search the open and working laptop was some four to five minutes after the officers and Defendant had initially left the residence. This would include any subsequent media that the Defendant agreed to allow the officers to search. At approximately eleven minutes, the Defendant is told by Agent Ray that he was not under arrest and did not have to talk with them. The written consent to search which clearly notified the Defendant of his constitutional rights, Government's Exhibit No. 3, was not signed until some forty-five minutes after the beginning of the recording when everyone had initially left the residence. Therefore, this Court finds that subsequent written consent is a sufficient intervening circumstance to purge any taint which the Court may find resulting from the initial entry into the residence.

117. The third factor is the purpose and flagrancy of the official misconduct. In Myers, the initial alleged illegal entry on property was not the cause of the defendant's consent. The defendant in Myers consented to the search because she did not think there were any drugs in her house and did not think the police would find anything. As a result, the Myers court found that the officers did not exploit the discovery of an item of contraband outside the residence simply to serve as a subterfuge to obtain the defendant's consent. The same is applicable in this case. There is no evidence to suggest that the officers entered the residence for the purposes of obtaining the Defendant's consent. The

officers entered specifically to dispel any fears that the Defendant may have been in distress based upon the totality of the circumstances combined with the neighbor's specific request that they check on the Defendant. Should the District Court disagree with this Court's findings and determine that the initial entry into the residence was illegal, this Court finds that under the applicable case law, the Defendant's subsequent consents were free of any such taint from any alleged illegal entry based upon the relevant factors suggested by the Eleventh Circuit case law as analyzed herein.

118. Finally, the Defendant's challenge to the search warrant is simply under the Wong Sun fruit of the poisonous tree argument. Based upon this Court's findings that the search of the Defendant's residence and subsequent statements made by him are not subject to suppression, any items of evidence obtained as a result thereof and utilized in obtaining the search warrant from this Court, are not tainted. Therefore, any items seized pursuant to the search warrant issued by this Court are not fruit of the poisonous tree and are admissible.

**ACCORDINGLY**, this Court recommends to the District Court that the Defendant's Motion To Suppress Physical And Testimonial Evidence [D.E. #18] be **DENIED**.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable Jose E. Martinez, the United States District Judge assigned to this case.

**DONE AND SUBMITTED** this /7/ day of September, 2010, at Ft. Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc:
Hon. Jose E. Martinez
AUSA Carmen M. Lineberger
AFPD Robin Rosen-Evans

.